**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 12-3747
_____

CG; SB, parents of minor children
enrolled in the Lancaster School District; WM; LS; DR; LC;
AOP; RJ, parents of minor children enrolled in the Reading
School District on behalf of their children, LP, SLB, BB, EE,
DER, KC, AO, MJ and GJ, on behalf of all other similarly
situated children in Pennsylvania

v.

THE COMMONWEALTH OF PENNSYLVANIA
DEPARTMENT OF EDUCATION;
GERALD ZAHORCHAK, its Secretary

CG; SB; LS; DR; LC,
                    Appellants
_____

On Appeal from the United States District Court
for the Middle District of Pennsylvania
(D.C. No. 1-06-cv-01523)
District Judge: Honorable Yvette Kane
_____

Argued: September 10, 2013

Before: SMITH, SHWARTZ, and ROTH, Circuit Judges.

(Filed: November 5, 2013)

Kevin L. Quisenberry, Esq. [ARGUED]
Evalynn Welling, Esq.

Community Justice Project
429 Forbes Avenue
Suite 800
Pittsburgh, PA 15219
    *Counsel for Appellants*

Sean A. Kirkpatrick, Esq. [ARGUED]
Office of Attorney General of Pennsylvania
Strawberry Square
15th Floor
Harrisburg, PA 17120-0000
    *Counsel for Appellees*

Sonja D. Kerr, Esq.
Public Interest Law Center of Philadelphia
1709 Benjamin Franklin Parkway
United Way Building
2nd Floor
Philadelphia, PA 19103
    *Counsel for Amici*

———————————

OPINION OF THE COURT
———————————

SHWARTZ, Circuit Judge.

I.

Plaintiffs are members of a class of disabled students who attend schools in certain districts in Pennsylvania and who claim that Pennsylvania's method for distributing special education funds violates various laws, including the Individuals with Disabilities Education Act ["IDEA"], Americans with Disabilities Act ["ADA"], and the Rehabilitation Act ["RA"]. After a bench trial, the District Court found that the funding formula did not deprive the class of a free appropriate public education ["FAPE"] as required by the IDEA and did not discriminate against them in violation of either the ADA or RA. Plaintiffs do not challenge the District Court's finding that the funding formula does not violate the IDEA but do challenge its

2

conclusions about their ADA and RA claims.[1]   Although compliance with the IDEA through the provision of a FAPE does not immunize a program or practice from being challenged under the ADA or RA, we agree with the District Court that Plaintiffs did not produce evidence showing that Pennsylvania's funding program violates the ADA or RA and will thus affirm.

II.

Under the IDEA, states that provide special education funds are eligible for federal funds to implement state-wide special education programs that guarantee a FAPE to eligible disabled children.  20 U.S.C. § 1412(a)(1)(A).   To this end, Pennsylvania enacted 24 P.S. § 25-2509.5, which sets forth its special education funding formula.  Under the formula, each school district receives, among other things, a base supplement, which is calculated by taking the total amount of base supplement money available and apportioning it among all districts based on the average daily membership of the district from the prior year under the assumption that 16% of students in each district are disabled.

The class relevant to this appeal encompasses "all identified special-needs students attending schools with a 17% or greater enrollment of special needs students and with a [market value/personal income ratio] of .65 or greater" (hereinafter the "class districts").[2]   After trial, the District Court found that the majority of children in Pennsylvania attend schools in districts where the disabled students constitute 15% or less of the district's student population (hereinafter the "nonclass districts").  Plaintiffs' expert, Dr. Bruce Baker, provided evidence that the average special education subsidy per special education student in the class

---

[1] Plaintiffs asserted other claims for which judgment was entered in favor of Defendants either on summary judgment or after trial but they do not appeal these rulings.

[2] The District Court certified a second class that was comprised of disabled students with limited English proficiency ["LEP"] who attend school districts that have a 10% or greater population of LEP students.  Claims on behalf on this class are not being pursued in this appeal.

totaled $3327 and the average special education subsidy per special education student who attended schools in nonclass districts totaled $4108. Thus, students in the class, namely those who attend schools in districts where the disabled student population exceeds 17%, receive less funding per student than nonclass students.

Aside from evidence showing differences in funding per student, Dr. Baker provided evidence that: (1) students in class districts who received individualized educational plans[3] ["IEP"] under the IDEA scored lower on Pennsylvania's standardized reading and math tests than IEP students in nonclass districts;[4] and (2) the graduation rates for IEP students in class districts was lower than the rate for IEP students in nonclass districts.[5] Dr. Baker did not, however: (1) provide evidence about or evaluate the relationship between the receipt of a FAPE and funding levels; (2) consider the other funding sources that districts received or how districts allocated resources; (3) evaluate the appropriateness or implementation of the IEPs for students in either class or nonclass districts; or (4) evaluate the adequacy of the services provided. Moreover, Plaintiffs produced no

---

[3]An IEP has been described as the "primary mechanism" for implementing a FAPE. W.B. v. Matula, 67 F.3d 484, 492 (3d Cir. 1995). It is developed by a team of educators, specialists, and the student's parents to set forth a plan that will "enable the child to receive meaningful educational benefits in light of the student's intellectual potential" and unique needs. Shore Reg'l High Sch. Bd. of Educ. v. P.S., 381 F.3d 194, 198 (3d Cir. 2004) (internal quotation marks and citations omitted).

[4] The District Court heard evidence concerning the Reading, Lancaster, Allentown, York City, and Harrisburg school districts. There was insufficient evidence to show that students attending the Reading and Allentown School Districts were members of the class.

[5] In discussing the standardized test performance and graduation rates, the District Court did not use the words "disabled students," but rather described the students as those who receive IEPs. It is understood that these students would be protected under the laws at issue in this case.

4

evidence to show that any student was deprived of a service because of Pennsylvania's funding formula.

Aside from Dr. Baker, the District Court heard testimony from parents and/or educators of six students. Five of the students attended school in nonclass districts and one attended school in a class district. The District Court found that Plaintiffs had failed to produce a single witness to testify that an IEP for any student was affected by a lack of funding or that any child had been denied a FAPE as a result of the funding formula, and stated that even if a student had been denied a FAPE, that denial necessarily was "the result of problems with the components of individual programs rather than systemic violations" and could have been remedied by taking advantage of existing administrative procedures, not by increased funding.[6] App. 48. In short, the District Court concluded that Plaintiffs did not show that the funding formula systematically denied students of a FAPE in violation of the IDEA. The District Court further observed that while the evidence from Dr. Baker concerning the different educational outcomes for special education students in the class districts was "compelling," App. 49, this evidence was of limited value in this case because Dr. Baker could not "directly tie funding levels to a denial of FAPE." Id.

With respect to Plaintiffs' ADA and RA claims, the District Court observed that Plaintiffs' claim that they were denied access to education services was based on the "same allegations and theories that underlie their IDEA claim."

---

[6] The class student's parent testified about dissatisfaction at certain times with certain matters, such as the delay in commencing speech therapy during one academic year, the quality of the adaptive gym class, and the child's access to computers, but the parent presented no testimony that any of these issues arose due to funding, and there was no evidence presented that these issues were emblematic of a systemic problem. As to the parents of students in nonclass districts, they too testified about having raised concerns about services that they sought for their children. They testified that their concerns were largely addressed and, to the extent a concern remained unaddressed, they provided no testimony that it was due to funding.

App. 59. Acknowledging that there are circumstances in which a school could comply with the IDEA and yet fail to comply with the ADA and the RA, id. at 60 n.23, the District Court found based upon this record that "[b]ecause Plaintiffs have failed to establish a violation of the IDEA, and because the Section 504 and ADA claims are inextricably linked to the IDEA claims," they did not establish a violation of the ADA or RA. App. 59. As a result, the District Court entered judgment in favor of Defendants on all claims. Plaintiffs appeal only the District Court's judgment on the ADA and RA claims.

When reviewing a judgment entered after a bench trial, we exercise plenary review over the District Court's conclusions of law and review the District Court's findings of fact for clear error. Battoni v. IBEW Local Union No. 102 Emp. Pension Plan, 594 F.3d 230, 233 (3d Cir. 2010). Because Plaintiffs do not challenge any of the District Court's findings of fact, we accept the findings as true and exercise plenary review over the District Court's legal conclusions.

III.

The IDEA governs the affirmative duty to provide a public education to disabled students, while the ADA and RA embody the negative prohibition against depriving disabled students of public education. W.B. v. Matula, 67 F.3d 484, 492-93 (3d Cir. 1995). Thus, the IDEA provides a remedy for "inappropriate educational placement decisions, regardless of discrimination," while the ADA and RA prohibit and provide a remedy for discrimination.[7] Hornstine

---

[7] The ADA provides:

> [N]o qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity.

42 U.S.C. § 12132. Moreover, the relevant regulations state that:

6

v. Twp. of Moorestown, 263 F. Supp. 2d 887, 901 (D.N.J. 2003) (plaintiff received a FAPE but policy that sought to deny her valedictorian status was nonetheless discriminatory under the ADA and RA).

---

> A public entity, in providing any aid, benefit, or service, may not, directly or through contractual, licensing, or other arrangements, on the basis of disability--
>
> (i) Deny a qualified individual with a disability the opportunity to participate in or benefit from the aid, benefit, or service;
>
> (ii) Afford a qualified individual with a disability an opportunity to participate in or benefit from the aid, benefit, or service that is not equal to that afforded others; [or]
>
> (iii) Provide a qualified individual with a disability with an aid, benefit, or service that is not as effective in affording equal opportunity to obtain the same result, to gain the same benefit, or to reach the same level of achievement as that provided to others . . . .

28 C.F.R. § 35.130(b)(1)(i)-(iii). The RA provides:

> No otherwise qualified individual with a disability in the United States, as defined in section 705(20) of this title, shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance . . . .

29 U.S.C. § 794(a).

Failure to provide a FAPE violates Part B of the IDEA[8] and generally violates the ADA and RA because it deprives disabled students of a benefit that non-disabled students receive simply by attending school in the normal course—a free, appropriate public education.[9] See Andrew M. v. Del. Cnty. Office of Mental Health and Mental Retardation, 490 F.3d 337, 350 (3d Cir. 2007). Indeed, in many cases, a plaintiff's sole theory of RA and ADA discrimination is that the defendant school failed to provide a FAPE. Id. Failing to provide a FAPE in violation of the IDEA, however, is not the sole basis on which a student may bring a claim of discrimination under the ADA and RA. In fact, the IDEA itself states that it should not be "construed to restrict or limit the rights, procedures, and remedies available under the Constitution, the Americans with Disabilities Act of 1990, title V of the Rehabilitation Act of 1973, or other Federal laws protecting the rights of children with disabilities." 20 U.S.C. § 1415(*l*). Thus, the IDEA does not restrict a student's ability to pursue claims under the ADA and RA, and compliance with the IDEA does not automatically immunize a party from liability under the ADA or RA. See K.M. v. Tustin Unified Sch. Dist., 725 F.3d 1088,

---

[8] The IDEA requires states receiving federal special education assistance to "establish and maintain procedures in accordance with this section to ensure that children with disabilities and their parents are guaranteed procedural safeguards with respect to the provision of a free appropriate public education." 20 U.S.C. § 1415(a).

[9] Providing a FAPE may also demonstrate compliance with the RA. For instance, in D.K. v. Abington Sch. Dist., this Court examined the school's actions and found that it took proactive steps to provide the plaintiff assistance (such as extra time for assignments and a specialist) and provide a FAPE, and thus complied with the RA by reasonably accommodating a handicapped child to ensure meaningful access to and participation in educational benefits. 696 F.3d 233, 252-53 (3d Cir. 2012). In that case, "a finding that the school district did not deny D.K. a FAPE [was] equally dispositive of [the plaintiff's] § 504 claim." 696 F.3d at 253 n.8.

1102 (9th Cir. 2013); <u>Ellenberg v. N.M. Military Inst.</u>, 478 F.3d 1262, 1281-82 (10th Cir. 2007); <u>Hornstine</u>, 263 F. Supp. 2d at 901.

Plaintiffs take no exception to the District Court's finding that they received a FAPE or its conclusion that the funding scheme does not violate the IDEA. Rather, they now assert that Defendants violated the ADA and RA, not based upon an alleged failure to provide a FAPE, but on other grounds.

With limited exceptions,[10] the same legal principles govern ADA and RA claims. To prove a claim under either the ADA or RA, Plaintiffs must show that: (1) they are handicapped or disabled as defined under the statutes; (2) they are otherwise qualified to participate in the program at issue; and (3) they were precluded from participating in a program or receiving a service or benefit because of their disability. <u>Chambers ex rel. Chambers</u>, 587 F.3d at 189.

The statutes' respective causation elements differ. <u>See</u> 42 U.S.C. § 12132 ("by reason of such disability"); 29 U.S.C. § 794(a) ("solely by reason of her or his disability"). The RA allows a plaintiff to recover if he or she were deprived of an opportunity to participate in a program solely on the basis of disability, while the ADA covers discrimination on the basis of disability, even if there is another cause as well.[11] To

---

[10] One difference between the ADA and RA is that to bring a claim under the RA, a plaintiff must show that the allegedly discriminating entity receives federal funding. <u>Chambers ex rel. Chambers v. Sch. Dist. of Phila. Bd. of Educ.</u>, 587 F.3d 176, 189 n.20 (3d Cir. 2009). There is no dispute that Defendants receive federal funds and are therefore subject to the provisions of the RA. Another difference involves the causation element, which will be examined later in the discussion.

[11] Because the RA's causation requirement requires disability to be the sole cause of discrimination, an alternative cause is fatal to an RA claim because disability would no longer be the sole cause. <u>See, e.g.</u>, <u>Menkowitz v. Pottstown Mem'l Med. Ctr.</u>, 154 F.3d 113, 125 (3d Cir. 1998). The existence of an alternative cause, however, may not

satisfy either causation requirement, Plaintiffs must prove that they were treated differently based on the protected characteristic, namely the existence of their disability. This is because the "main thrust" of the ADA and RA "is to assure handicapped individuals receive the same benefits as the non-handicapped," Easley v. Snider, 36 F.3d 297, 305 (3d Cir. 1994), as well as to prohibit discrimination against one "subgroup" of disabled people as compared to another subgroup if the characteristic distinguishing the two subgroups is the nature of their respective disability. Id. at 306 (finding no ADA or RA violation because there was no "discrimination against a subgroup of the group of people who are physically disabled"); cf. Olmstead v. L.C. ex rel. Zimring, 527 U.S. 581, 598 n.10 (1999) (stating that discrimination may exist among members of the same general protected class). In other words, Plaintiffs must show that they have been deprived of a benefit or opportunity provided to non-disabled students or a group of students with some other category of disability, because of their disability. They have not done so.[12]

---

necessarily be fatal to an ADA claim so long as disability "played a role in the . . . decisionmaking process and . . . had a determinative effect on the outcome of that process." New Directions Treatment Servs. v. City of Reading, 490 F.3d 293, 300 n.4 (3d Cir. 2007) (reversing the denial of summary judgment in favor of plaintiff in part because the District Court improperly applied the RA's sole causation requirement to plaintiff's ADA claim, which required only "but for" causation).

[12] There is no dispute that Plaintiffs arguably satisfy certain elements of a claim under the ADA or the RA, namely: (1) they are disabled; (2) they are otherwise qualified to participate in school activities; and (3) as to the RA claim specifically, the school receives federal financial assistance. As to the causation element, Plaintiffs have presented some evidence that educational performance (as measured by test scores and graduation rates) in class districts is lower as compared to non-class districts, but they did not prove that lack of supplemental funding is a cause or the sole cause of those discrepancies and that these funding decisions were based on disability.

The core of Plaintiffs' claim is that Pennsylvania's funding formula distributes supplemental special education funds in a manner that gives school districts with higher numbers of disabled students less supplemental funding per disabled student than those districts with lower numbers of disabled students. Even assuming that this scheme has a disparate impact on certain disabled students,[13] and even if the inequity stems at least in part from the location of their school, this alone is insufficient to prove a claim under the RA or ADA. Indeed, the Supreme Court has "reject[ed] the boundless notion that all disparate-impact showings constitute prima facie cases under" the RA. Alexander v. Choate, 469 U.S. 287. 299 (1985). Rather, as Alexander instructed, the Act requires that "an otherwise qualified handicapped individual must be provided with meaningful access to the benefit" offered. Id. at 301. Thus, to establish liability, Plaintiffs must prove that the qualified individual has been deprived of meaningful access to a benefit to which he or she was entitled.

Plaintiffs here have failed to produce evidence to show that the funding formula deprived the class members of a program, benefit, or service that was provided to the

---

[13] Judge Roth notes that she does not consider the disparate impact of the funding mechanism here to be an "even if" assumption. She concludes that this funding mechanism subjects students with disabilities to disparate treatment "by reason of" their disability. 29 U.S.C. § 12132; 42 U.S.C. § 794(a). Pennsylvania specifically selected a funding formula that depends, in part, on its assumptions about the concentration of students with disabilities. The funding formula therefore takes the student's disability status as a relevant metric in distributing funds. Having done so, the formula then provides less funding for some students with a disability *vis-à-vis* others—the very essence of a disparate impact claim. See Olmstead, 527 U.S. at 598 & n.10 (noting that discrimination prohibited by the ADA includes policies that create differential effects between the same class of individuals); Helen L. v. DiDario, 46 F.3d 325, 336 n.21 (3d Cir. 1995) (same).

disabled students who attend schools in the nonclass districts. The District Court's unchallenged factual findings support the conclusion that there is an absence of evidence that any class member was deprived of a service available to nonclass members.[14] Thus, based on this record, we are compelled to reject Plaintiffs' claim that the use of the 16% figure and its resulting disparity in per student funding for students in class districts as compared to nonclass districts violates the ADA or RA.

IV.

For the foregoing reasons, we will affirm the judgment of the District Court.

---

[14] As the District Court appropriately noted, Plaintiffs produced performance metrics that appear to show that the special education students in Pennsylvania are not making the type of progress that one would hope they could achieve. That said, the role of a federal court is to evaluate the evidence under the governing law. Here, the evidence adduced did not show that these differing outcomes were the result of the funding formula and thus, Plaintiffs have not demonstrated on this record that the formula violates the RA or ADA.